UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| FRED LEIGHTON HOLDING, INC., et al., | : Case Nos.    08- 11363 (RDD) |
| | : |
| Debtors. | : Jointly Administered |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF RALPH O. ESMERIAN
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

STATE OF NEW YORK      )
                                          )ss.:
COUNTY OF NEW YORK  )

RALPH O. ESMERIAN, being duly sworn, states:

1.   I am the sole shareholder of Fred Leighton Holding, Inc. ("Fred Leighton")[1], the parent company of  Fred Leighton LLC; Phoenix Nevada 1, LLC; and Fred Leighton BH LLC (together the "Fred Leighton Debtors").   I am also the 100%  member of Calypso Mines LLC ("Calypso"), Endymion, LLC ("Endymion"), and Foxtrot LLC ("Foxtrot"), and the 65% shareholder of R. Esmerian, Inc. ("REI") which owns Tango, LLC.  ("Tango").

2.   Calypso, Endymion, Foxtrot and Tango (hereafter referred to as the "Debtor LLC's") were  formed  at  the  insistence  of  Merrill  Lynch  Mortgage  Capital,  Inc.  ("Merrill  Lynch") pursuant to a financing arrangement.  Merrill Lynch recently took a write-down of $25.1 billion on its subprime mortgage portfolios.   It is my belief that Merrill Lynch's problems with its

---

[1] Fred Leighton was previously named Samba I, Inc.

subprime mortgage portfolio were the root cause giving rise to the necessity for the filing of these chapter 11 filings.[2]

3. I submit this affidavit pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") in support of: (1) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"); (2) "first-day" relief in the form of motions and applications that the Debtors have requested of the Court (the "First-Day Pleadings"); and (3) to assist the Court and other interested parties in understanding the circumstances that compelled the commencement of these chapter 11 cases. Except as otherwise indicated, all facts set forth in this affidavit are based upon personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations. If called upon to testify, I would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of each of the Debtors.

4. Part I of this affidavit is intended to provide a summary background and overview of the Debtors' historical and business operations. Part II of this affidavit contains information required by Local Rule 1007-2.

## PART I:  BACKGROUND INFORMATION

**My Personal Background**

5. My family has been in the jewelry business for three generations and has acquired, I think it is fair to say, an esteemed reputation as connoisseurs of fine jewelry. As explained by Francois Curiel, the worldwide head of Christie's jewelry department:

> Since I arrived in New York to open a Christie's salesroom more
> than 30 years ago, I can still recall my fascination and admiration

---

[2] See, for example, the January 18, 2008 article in the New York Times at page __, and Wall Street Journal, April 2, 2008 at page A1.

upon meeting a fourth-generation family jeweller and art collector, Ralph Esmerian. As a passionate jewelry expert, I was awed by the magnificent gemstones collected by Ralph and his father, Raphael, and impressed by his universal knowledge, exquisite taste and appreciation for rare and historic jewels. Ralph was greatly inspired by his father, who since the 1940s, had been an entrusted gemstone advisor to the most esteemed jewelry houses and distinguished jewelry collectors. When Pierre Cartier needed advise on how to improve the famed Rockefeller Sapphire (Christie's NY, $3.03 m), a magnificent stone purchased by John D. Rockefeller Jr. in 1934 from an Indian Maharajah, they sought Raphael. I knew that Ralph's dedication to continue his father's legacy would one day produce one of the most distinctive and prestigious collections in the jewelry field.

See Exhibit 1 hereto at 1.

6. I have a great appreciation for fine jewelry and other objects and a deep commitment to education and the preservation of such objects in museums. I am a founding member of Gemcore Laboratory, a not-for-profit laboratory which conducts research on gem material and mines. I am also Vice Chairman of the National Jewelry Institute, an educational not-for-profit organization which organizes jewelry exhibitions in American and European museums.

7. Following my graduation from Princeton University, I amassed a wonderful collection of American folk art. I donated this collection to the American Folk Art Museum on 53rd Street in New York City, of which I was the President of the Board of Trustees for 25 years and now serve as a Chairman Emeritus. My folk art collection comprises the core of the Museum's collection.

8. My grandfather, father and I have collected some of the finest jewels in the world over the last hundred years. Out of this large collection we have what we call the "Special Collection" which consists of iconic jewels created over the past several hundred years which have been exhibited in museums throughout the world. Francois Curiel recently described the Special Collection as follows:

When I reflect upon all that I have seen during my career, both at auction and privately, and envision the next "Great Collection" -- one that would surpass all records and make auction history – I think of Esmerian. I have participated in many of his important acquisitions over the years and can say, without hesitation, that his collection is unparalleled to any in the world for its provenance, breadth, size and rarity.

Never before has one jewelry collection held such a great number of quintessential pieces from the 17th century, to the Art Nouveau and Art Deco periods and into the 21st century. One such jewel in the collection, regarded as one of the most famous of the Gilded Age and a personal favourite, is Empress Eugenie's diamond bow brooch from The French Crown Jewels, which was later owned by Mrs. William B. Astor. I am also astounded by The Taj Mahal Emerald of 141.13 carats made for Shah Jahan (1630-1650), certainly one of the most accredited jewels in historical reference books. From one great provenance to the next, this collection represents a walk through some of history's most prominent figures and their jewels. From the collection of gemstones, the cornerstone of the business, I am awestruck by the fancy intense pink diamond of 14.23 carats, the rarest natural wonder known to exist. I am also impressed by the comprehensive and noteworthy collection of Art Nouveau masterpieces made by the masters of this brief but critical period in jewelry history, including Rene Lalique, Boucheron, Vever and Fouquet.

*See Exhibit 1 at 1-2.*

**The Necessity For The Chapter 11 Filings**

9.  In 2005, the Special Collection of 101 pieces was appraised by an esteemed jewelry expert named Benjamin Zucker for $89 million at retail value. Merrill Lynch as part of the initial loan transaction with Calypso, accepted the Zucker appraisal and loaned Calypso $57 million or 60% of the retail value of the Special Collection in December 2005 (the "Calypso Loan").

10. Thereafter, in March 2006, Merrill Lynch loaned Fred Leighton $110 million with which I purchased the Fred Leighton business, which held approximately $100 million of antique jewelry valued at cost. Merrill Lynch also provided a line of credit for the Fred Leighton

business of an additional $20 million (together, the "Fred Leighton Loan"). At the present time, the total amount owed to Merrill Lynch under the Calypso Loan and the Fred Leighton Loan (together, the "Merrill Lynch Debt") is approximately $181,000,000.

11. The Merrill Lynch Debt is presently secured by five separate collections of jewelry with an aggregate value of at least $255 million:

a.  The Special Collection, owned by Calypso, which now consists of 83 museum quality pieces with an appraised retail value of approximately $75 million;

b.  The Foxtrot jewelry which consists of 10 items with an appraised retail value of approximately $33 million;

c.  The Tango jewelry which consists of approximately 1,500 items with a value at cost of approximately $25 million;

d.  The Endymion jewelry which consists of approximately 250 items with a value at cost of approximately $24 million; and

e.  The Fred Leighton jewelry inventory which consists of approximately 10,000 items with a value at cost of approximately $99 million.

12. Thus, as Merrill Lynch has consistently acknowledged, the Merrill Lynch Debt is grossly over-collateralized.  Indeed, in its original credit memo dated October 21, 2005 (the "Merrill Lynch Credit Memo"), a copy of which is annexed hereto as <u>Exhibit 2</u>, Merrill Lynch acknowledged:

> Excess Collateral
>
> Both loans are secured by excess collateral beyond the primary collateral bases.  The Special Collection Loan and the Acquisition Loan are collateralized with $89.2 million and $230.0 million of appraised value jewels, respectively.  Beyond that, each loan is supported by an additional $30.0 million *each* of jewels valued at wholesale cost, which has an estimated minimum retail value of $75.0 million each.  Additionally, for each of the first 3 years, the

Acquisition Loan will be bolstered by an annual $10.0 million inventory contribution to FL NewCo by Esmerian which will be captured as collateral. Further protection is provided by a 6-month interest reserve for the Acquisition Loan. Both loans will contain cross-default and cross-collateralization mechanisms. Esmerian and his wholesale business, REI, will provide full-recourse guarantees for both loans also.

*See Exhibit 2 at 11.*

13. Unfortunately, after being forced to write down $16.7 billion in the value of its assets, due to its own improvident investments – wiping out the last four years' of its earnings -- Merrill Lynch, desperate to obtain a quick cash infusion, now seeks to auction off the Special Collection on April 15, 2008, even though the auction process will result in an utter dissipation of the value of this magnificent collection. Indeed, Merrill Lynch's own underwriting documents demonstrate that Merrill Lynch knew, before it made the Special Collection Loan, that at auction the Special Collection would realize less than one half of the amount Merrill Lynch loaned against the Special Collection. *See Exhibit 2.* The Catalogue for the Christies Auction confirms that conclusion, and further emphasizes that an auction sale is not the proper vehicle to sell the Special Collection.

14. While auctions often realize more than retail value for lower priced jewels, auctions realize only one-third the value for collector's items like those in the Special Collection. The reason for this is that the value of the items in the Special Collection is in the items as art work, rather than the value of the elements of each jewel. Thus, unlike a gem which can be valued like a commodity, jewelled objects have a value based upon their unique significance as art work. These items can only be fully appreciated by collections and institutions whose curators are educated to understand the significance of each of these items. In my experience, such items are

sold at auction for one-third of their retail value and they are purchased by dealers, many of whom will not bid against each other, who then sell the items to museums or collectors.

15. The dissipation of the Special Collection will have a significant adverse effect upon all of the Debtors because it was always my business plan for the Fred Leighton business, as approved by Merrill Lynch, to sell the Special Collection gradually through an expanded Fred Leighton business in such locations as Beverly Hills, California and possibly in international centers of wealth. At Merrill Lynch's insistence, the Debtors have leased a store on Rodeo Drive in Beverly Hills and we are in the process of renovating that store for a September 2008 opening. It is the Debtors' intention to feature many of the items of the Special Collection in the store opening.

16. Merrill Lynch instituted litigation against the LLC Debtors, REI and me in New York Supreme Court in January 2008 (the "State Court Action") and sought, unsuccessfully, the appointment of a receiver. Despite the LLC Debtors' vigorous objections, the court allowed Merrill Lynch to proceed to auction off items of the Special Collection that were in Merrill Lynch's possession, with the exception of certain items that the court agreed the Debtors could try to sell themselves, so as to preserve their value.

17. The Debtors were then able to sell 18 items from the Special Collection at or above their appraised retail value, generating approximately $10 million which was paid to Merrill Lynch in March 2008. The sale price for those items totaled almost 50% of Christie's low estimate for all 87 items of the Special Collection and, in each instance, the sales price equaled or exceeded the appraised value which Merrill Lynch accepted as the value of the item when it made the original Special Collection Loan on November 4, 2005. On March 6, 2008, the net proceeds of those sales -- $9,950,893.90 -- were wired to Merrill Lynch.

HF 4073328 v.4 #13526/0001 04/15/2008 07:01 PM

18. Because the Christie's auction would have dissipated the value of the major portion of the Special Collection and caused incalculable injury to the Fred Leighton business, the Debtors filed their petitions herein.

**The Fred Leighton Business**

19. I believe that Fred Leighton is the finest retail purveyor of fine quality antique jewelry in the world. In that belief, I allowed Endymion, Tango and Foxtrot to be formed and to pledge jewelry to secure the Merrill Lynch Debt incurred in connection with the acquisition of the Fred Leighton business.[3] Fred Leighton was required to provide a retail outlet for the collections of jewelry that are now in the Debtor LLC's. Fred Leighton operates a store on Madison Avenue and 66th Street; it operates a store in the Bellagio Hotel in Las Vegas; and it sells jewelry through consignment at luxury department stores such as Neiman Marcus and Bergdorf Goodman pursuant to relationships that were established by my father, Raphael Esmerian, many years ago.

20. Over the years, Fred Leighton established relationships with dozens of celebrities and gained a reputation as a "jeweler to the stars" based upon its ability to pick the perfect piece for each celebrity to wear. To this day, Fred Leighton's jewelry can be seen at all the Hollywood events including the Oscars, the Emmys and the Golden Globe Awards.

21. I believe that the Fred Leighton business is recession- proof because its customers are primarily extremely wealthy people whose fortunes are not dependent upon economic cycles. Merrill Lynch agreed with my assessment when it underwrote the Fred Leighton Loan. As acknowledged in the Merrill Lynch Credit Memo:

---

[3] The Endymion, Tango and Foxtrot collateral pledges of inventory to Merrill Lynch are particularly troublesome in a bankruptcy context by virtue of the total absence of legal title and fair consideration attendant to those transfers.

**Industry Risk**

> We are confident that FL NewCo can withstand an economic downturn, as we view their business models as non-cyclical. Supply in the antique and estate jewelry market is very limited, and demand remains fairly steady among the world's upper classes. It is possible, albeit unlikely, that there could be a depression in the prices of diamonds and colored stones which could affect NewCo's inventory prices. **However, given the rare and historical nature of many of the pieces, we feel it is unlikely that their market values would be significantly affected.**

*See Exhibit 2 at 11*; emphasis added. At the time the Special Collection loan was underwritten by Merrill Lynch, it was contemplated that I would acquire Fred Leighton. The acquisition was concluded on March 29, 2006. In addition to the collateral securing the Merrill Lynch Debt, Merrill Lynch was granted a warrant to acquire 12% of Fred Leighton stock for the nominal consideration of $136.36.

22. Merrill Lynch went into the Fred Leighton loan relationship with knowledge that the business could not initially service the debt. Indeed, as stated in a Merrill Lynch document produced in discovery in the State Court Action, a copy of which is annexed hereto as Exhibit 3:

> PROJECT NILE
> Financial Model Summary
>
> > -doesn't make any economic sense as the interest is too high resulting in insufficient cash flow to pay taxes, so revolver take-down is required which places them further and further into debt

*See Exhibit 3.*

23. Moreover, Merrill Lynch understood the time element and attendant risks involved in the expansion of the Fred Leighton business plan to additional retail locations:

Execution Risk

FL NewCo is executing on a strategic plan to extend the Fred Leighton brand domestically and abroad by opening new locations. The opening of each store requires $1.0 million to $3.0 million of capital investment for the leasehold

improvements. If the new store fails to break even within a certain timeframe, it could strain the cash flows of the business and impair its ability to service the debt.

*See Exhibit 2 at 11.*

24. Although Merrill Lynch aggressively pursued the financing of the acquisition of the Fred Leighton business, the honeymoon was over virtually as soon as Merrill Lynch booked the millions of dollars of fees it earned upon the loan closing. *See Exhibit 2, page 2.* Virtually from the day the loan closed, Merrill Lynch constantly focused on technical defaults under the loan documents which existed from the date of the closing.

25. Using those technical defaults as leverage, Merrill Lynch constantly pressured me in innumerable ways. For example, Merrill Lynch personnel threatened to call defaults if I did not provide additional collateral and, even though there was no consideration from Merrill Lynch, in April 2007 I formed Foxtrot and pledged an additional $33 million of items at appraised retail value.

26. Merrill Lynch demanded that I invest a few million of my personal funds into the business and then declared a default because it took me a few months to raise the funds. Merrill Lynch demanded that I replace Fred Leighton's law firm with a firm more to Merrill Lynch's liking. Merrill Lynch demanded that I replace Fred Leighton's accounting firm with an accounting firm more to Merrill Lynch's liking. Somehow, it didn't matter what I did to try to comply with Merrill Lynch's demands. The minute I complied, I was met with new demands.

27. Because Merrill Lynch has always been so grossly over-collateralized, it has never been concerned with conserving the assets of the business. Thus, it has imposed enormous costs upon the business through its constant audits of the collateral (never finding any material discrepancy) and through the outrageous legal fees it has imposed upon the Debtors. To take just one example, Merrill Lynch allowed its attorneys to run up and then demand that we pay

- 10 -

approximately $2 million in legal fees that Merrill Lynch had incurred in a four-month period in the fall of 2007 drafting a proposed forbearance agreement (utilizing three senior partners and a team of junior personnel, some of whom were flown up from Charlotte, North Carolina, at my expense, to work on the forbearance agreement).

**The Debtors' Business Operations**

28. The Debtors' business operations are run by the President of Fred Leighton, Peter Bacanovic, and by Fred Leighton's Chief Financial Officer, Satyajit Bose, both of whom have proven themselves to be eminently qualified for their positions. In total, the Debtors employ 24 people.

29. The Debtors' day-to-day retail operations are profitable and will provide sufficient cash flow to support the construction budget for the Beverly Hills store.[4]

30. The Debtors intend to continue to engage Benjamin Zucker to assist them in sales of the Special Collection items so that the Debtors can continue to pay down the Merrill Lynch Debt. Mr. Zucker has agreed to work on an 8% commission on sales and, pursuant to the order of Justice Freedman in the State Court Action, Mr. Zucker has been successfully working with the Debtors to sell the Special Collection items which that the court set aside from the Christie's auction.

31. Once the Debtors regain control of the Special Collection items in Christie's possession, they will expand their sales efforts to include these items as well. The Debtors seek to restore the arrangement provided for in the Merrill Lynch loan documents whereby the Special Collection items are maintained at a vault at J.P. Morgan Chase and can be removed only in my presence and the presence of a Merrill Lynch representative.

32. In order to sell these items, it is essential that I be permitted to show them to prospective purchasers in my office in Rockefeller Center. Although these items are of enormous value, they are fully insured by Lloyd's of London for their full value (*see* Exhibit 4 attached hereto) and we have never had a problem with a loss of any of Merrill Lynch's valuable collateral. *See Exhibit 2, page 12, and Exhibit 4.* The net proceeds of sales of the Special Collection items will be deposited into a segregated account pending a determination of the nature, extent and priority of the Merrill Lynch indebtedness.

33. Mr. Bacanovic is spearheading the Debtors' efforts to identify an appropriate equity investor and it is the Debtors' present intent to file a plan of reorganization ("Plan") within 30 days of the date when the Debtors regain dominion and control over the Special Collection and other collateral that Merrill Lynch is holding.

### POINT II: INFORMATION REQUIRED BY LOCAL RULE 1007-2

34. The nature of the Debtors' businesses and the circumstances leading to their filing of chapter 11 petitions are set forth above.

35. Pursuant to Rule 1007-2(a)(4) of the Local Rules, the Debtors are required to file with their petitions a list containing the names and addresses of the 20 largest unsecured creditors exclusive of insiders. That list is annexed hereto as Exhibit 5.

36. Pursuant to Local Rule 1007-2(a)(5), a list of the holders of the five largest secured creditors with claims against the assets of the Debtors, their addresses, claim amount, description and the estimated value of collateral securing each claim and whether the claim or lien is disputed is annexed hereto as Exhibit 6.

---

[4] There are, in any event, monies being held in an escrow account ($2.5 million) to complete construction of the Beverly Hills store.

HF 4073328 v.4 #13526/0001 04/15/2008 07:01 PM

37. The following is an unaudited summary of the Debtors' consolidated assets and liabilities as of February 29, 2008 ($ in millions):

| | |
|---|---|
| **Current Assets** | |
| Restricted and Unrestricted Cash | 5 |
| Net Accounts Receivable | 1 |
| BH Reserve at REI | 2 |
| Inventory | 255 |
| Other current assets | 1 |
| **Net Fixed Assets** | 2 |
| **Other Assets** | 5 |
| **Total Assets** | **271** |
| | |
| **Current Liabilities** | |
| Accounts Payable | 2 |
| Customer Credits Payable | 2 |
| Other Current Liabilities | 0 |
| Term Loan | 100 |
| Revolver | 71 |
| Accrued Interest | 8 |
| Due to Shareholders | 5 |
| **Total Liabilities** | **188** |
| **Stockholders' & Members' Equity** | **83** |
| **Total Liabilities and Equity** | **271** |

38. None of the Debtors has publicly held shares of stock, debentures or other securities.

39. Merrill Lynch, at 4 World Financial Center, 12th Floor, New York, NY 10080 and its agent, Christie's, have possession and control of most of the Special Collection and some items of Foxtrot, Tango, Endymion and Fred Leighton inventory. There is no other property of any of the Debtors in the possession or custody of any public officer, receiver, trustee, assignee for the benefit of creditors, mortgagee, pledge, assignee of rents, liquidator, secured creditor, or agent of any of such persons.

HF 4073328 v.4  #13526/0001 04/15/2008 07:01 PM

40. The Debtor LLCs maintain leased offices at 610 Fifth Avenue, New York, New York. Fred Leighton and its subsidiaries maintain corporate offices at 766 Madison Avenue, New York, New York 10065. In addition, Fred Leighton leases retail locations at 773 Madison Avenue, New York, NY 10065) and at the Bellagio Hotel in Las Vegas (3600 Las Vegas Boulevard South, Las Vegas, NV 89109), and is currently constructing a retail location in Beverly Hills, California (313-317 North Rodeo Drive, Beverly Hills, CA). .

41. The books and records of Fred Leighton and Endymion are maintained at 766 Madison Avenue, New York, New York, 10065. The books and records of Calypso, Foxtrot and Tango are maintained at 610 Fifth Avenue, New York, New York. The Debtors' substantial assets are located at its store premises and its bank vaults.

42. The following is a list of actions or proceedings pending or threatened against the Debtors where a judgment against any of the Debtors or a seizure of their property may be imminent: *Merrill Lynch Mortgage Capital, Inc. v. Ralph Esmerian, Calypso Mines LLC, Endymion, LLC, R. Esmerian Inc., Tango LLC and Foxtrot LLC* pending in the Supreme Court of the State of New York, County of New York and bearing Index Number 600012/2008.

43. Fred Leighton's executive officers and senior management and their tenure with Fred Leighton are as follows:

| Name | Title | Tenure |
|---|---|---|
| Ralph O. Esmerian | Executive Chairman of Fred Leighton | Two years |
| Peter Bacanovic | President of Fred Leighton | Three and one-half months |
| Satyajit Bose | Chief Financial Officer of Fred Leighton | 12 months |

HF 4073328 v.4 #13526/0001 04/15/2008 07:01 PM

44. Fred Leighton intends to continue the operation of its business and the management of its property pursuant to the provisions of chapter 11. The Debtors expect to file a consolidated plan of reorganization ("Plan") within 30 days of the date when the Debtors regain dominion and control over the Special Collection, and other collateral which Merrill Lynch is holding.

45. The estimated payroll, including payroll taxes and other fringe benefits for the Debtors' employees for the 30 days following the filing of the chapter 11 petition is approximately $200,000. Of this amount, the amount proposed to be paid for services to be rendered by officers, stockholders, and directors other than myself is $58,000. I do not draw a salary from any of the Debtors although, as jewelry of the Debtor LLC's is sold, the Debtor LLC's have been paid the amount due for the consigned inventory. We would expect that arrangement to continue until all of the Debtors are reorganized through a confirmed plan.

46. For the 30-day period following the filing of the chapter 11 petitions, the Debtors estimate the following cash flow for their retail operations:

| | |
|---|---|
| Cash receipts | $2,028,000 |
| Cash disbursements | $1,091,500 |
| Net cash gain (loss) | $936,500 |
| Accrued obligations (not including professional fees) | $1,650,000 |
| Accrued receivables | $429,000 |

47. The needs and interests of the Debtors and their creditors will be best served by the continued operation and management of their businesses as debtors-in-possession. As counsel has informed me, the Second Circuit held more than 25 years ago:

HF 4073328 v.4  #13526/0001 04/15/2008 07:01 PM

> . . . there must be some articulated business justification, other than appeasement of major creditors, for using selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition.

*In Re Lionel*, 772 F2d 1063, 1071 (1983 2nd Cir.)

48. There is no justification for allowing Merrill Lynch to continue its destructive conduct unabated. The Debtors can and will successfully reorganize under the protection of this Court.

49. A matrix list of the Debtors' creditors is being filed simultaneously herewith. Annexed hereto as <u>Exhibit 7</u> is a certification with respect to the matrix.

/s/ Ralph O. Esmerian
Ralph O. Esmerian

Sworn to before me this
14th day of April, 2008

/s/ Seth F. Kornbluth
Notary Public

HF 4073328 v.4 #13526/0001 04/15/2008 07:01 PM

# EXHIBIT 1

# INTRODUCTION

Since I arrived to New York to open a Christie's salesroom more than 30 years ago, I can still recall my fascination and admiration upon meeting a fourth-generation family jeweler and art collector, Ralph Esmerian. As a passionate jewelry expert, I was awed by the magnificent gemstones collected by Ralph and his father, Raphael, and impressed by his universal knowledge, exquisite taste and appreciation for rare and historic jewels. Ralph was greatly inspired by his father, who since the 1940s, had been an entrusted gemstone advisor to the most esteemed jewelry houses and distinguished jewelry collectors. When Pierre Cartier needed advise on how to improve the famed Rockefeller Sapphire (Christie's NY, $3.03m), a magnificent stone purchased by John D. Rockefeller Jr. in 1934 from an Indian Maharajah, they sought Raphael. I knew that Ralph's dedication to continue his father's legacy would one day produce one of the most distinctive and prestigious collections in the jewelry field.

Over the past thirty years, as International Head of Christie's Jewelry Department, I have been entrusted with some of the world's most extraordinary jewels, including those of Mouna Ayoub, Joan Crawford, Doris Duke, Florence Gould, Salimah Aga Khan, Marjorie Merriweather Post, Nelson Rockefeller, and the Estate of Mrs. James de Rothschild. It has been my honor and privilege to have handled these collections as well as the rarest diamonds and gemstones and other historic jewels.

When I reflect upon all that I have seen during my career, both at auction and privately, and envision the next "Great Collection"— one that would surpass all records and make auction history— I think of Esmerian. I have participated in many of his important acquisitions over the years and can say, without hesitation, that his collection is unparalleled to any in the world for its provenance, breadth, size and rarity.

Never before has one jewelry collection held such a great number of quintessential pieces from the 17th century, to the Art Nouveau and Art Deco periods and into the 21st century. One such jewel in the collection, regarded as one of the most famous of the Gilded Age and a personal favorite, is Empress Eugénie's diamond bow brooch from The French Crown Jewels, which was later owned by Mrs. William B. Astor. I am also astounded by The Taj Mahal Emerald of 141.13 carats made for Shah Jahan (1630–1650), certainly one of the most accredited jewels in historical reference books. From one great provenance to the next, this collection represents a walk through some of

CONFIDENTIAL

CHR 00553

history's most prominent figures and their jewels. From the collection of gemstones, the cornerstone of the business, I am awestruck by the fancy intense pink diamond of 14.23 carats, the rarest natural wonder known to exist. I am also impressed by the comprehensive and noteworthy collection of Art Nouveau masterpieces made by the masters of this brief but critical period in jewelry history, including René Lalique, Boucheron Vever and Fouquet.

Many of these jewels have been part of major exhibitions around the world and have been documented time and time again as superlative examples that define jewelry history. Their historical provenance, importance and rarity combine to form a consummate collection that would be a monumental auction event for us at Christie's.

FRANÇOIS CURIEL,
INTERNATIONAL DIRECTOR OF JEWELRY, CHAIRMAN OF CHRISTIE'S EUROPE
AND PRINCIPAL AUCTIONEER

  

CONFIDENTIAL

CHR 00554

EXHIBIT 2

| To: | Global Asset Based Finance Asset Review Committee |
| At: | See Distribution |

| From: | Josh Green, Ryan Bell, Jeremy Tucker |

**Merrill Lynch**

| At: | Global Asset Based Finance |
| Tel: | (212) 449-7330/7952/3057 |
| Date: | October 21, 2005 |

**Subject:** 1) **Ralph Esmerian LLC[1] $60.0 Million Secured Special Collection Term Loan ("Special Collection Loan"), and;**
2) **Fred Leighton NewCo LLC[1] $110.0 Million Secured Acquisition Term Loan ("Acquisition Term Loan") and up to $25.0 Million Secured Revolving Facility ("Revolver"), together the "Acquisition Loan".**

## I.  Executive Summary

The Global Asset Based Finance group ("GABF") through Merrill Lynch Commercial Finance Corp. ("Merrill" or "Merrill Lynch") seeks approval for two separate loan facilities totaling up to $195.0 million. These facilities include the $60.0 million Special Collection Loan and up to a $135.0 million Acquisition Loan (together the "Facilities"). The Special Collection Loan will be secured by two discrete scheduled pools of collateral, as well as full-recourse guarantees from Ralph Esmerian ("Esmerian") personally and R. Esmerian Inc. ("REI"), Esmerian's high-end jewelry wholesale business. The Acquisition Loan will be secured separately by two discrete scheduled pools of collateral, a full-recourse guarantee from Esmerian and REI, and a pledge of Fred Leighton NewCo LLC's ("FL NewCo") preferred and common membership units. Additionally, Merrill Lynch will receive warrants for 12.0% of the common membership units of FL NewCo. The Facilities will enable Esmerian to acquire Fred Leighton Ltd. and its affiliates ("FL Ltd."), a high-end jewelry retail business, and create substantial value by capturing a dedicated retail channel for his extensive wholesale operations.

The proceeds of the Special Collection Loan will be used by Ralph Esmerian LLC to buy his siblings' shares in the Special Collection and is priced at L+450 bps[2]; Esmerian intends to sell the Special Collection piecemeal (along with other jewels wholly-owned by Esmerian and REI) through the FL NewCo retail channel. The Special Collection Loan will have a fully-perfected first priority security interest in the Special Collection, which has been appraised at an insurance[3] value of $89.2 million and is insured by Lloyd's (rated Aa2/AA by Moody's/Fitch respectively) at this amount. The Special Collection Loan will be further collateralized by a separate $30.0 million pool of jewels valued at *wholesale cost* ("Special Collection Specified REI Jewels"). These jewels will be scheduled and subject to a negative pledge, holding them free and clear of any third-party liens. The implied wholesale value would likely exceed $37.5 million. Given this collateralization, the effective advance rate is approximately 47.4%.

The Acquisition Loan will be used by FL NewCo to buy FL Ltd. and operate the new entity. The $110.0 million Acquisition Term Loan will provide the financing for the $110.0 million purchase price and is priced at L+375 bps. The $25.0 million Revolver will provide working capital for inventory purchases and location expansion, and is priced at L+800 bps. The Acquisition Loan will be secured by a fully-perfected first priority security interest in the inventory of FL NewCo ("Inventory"). Sotheby's will be conducting an insurance value[4] appraisal that is expected to approximate $230.0 million; the inventory will be insured by Lloyd's at this value. Also, Esmerian is committed to add $10.0 million of inventory annually which will be treated as preferred membership unit investments. The Acquisition Loan collateral will be further enhanced by a $30.0 million pool of jewels valued at *wholesale cost* ("Acquisition Loan Specified REI Jewels") that is separate from the Inventory and the Special Collection pools; this

---

[1]  *The Ralph Esmerian LLC and Fred Leighton NewCo LLC will both be formed by Ralph Esmerian as Special Purpose Entities prior to closing.*
[2]  *The initial margin will be 500 bps, but will decrease to 450 bps when the Acquisition Loan closes.*
[3]  *Insurance value for the Special Collection is a wholesale/auction value. Please refer to Exhibit 2 for further details on sales channels.*
[4]  *Insurance value for the Inventory of the Acquisition Loan is a retail value. Please refer to Exhibit 2 for further details on sales channels.*

CONFIDENTIAL  ML003440

pool will be scheduled and subject to a negative pledge. Given the implied retail value of this discrete pool, the effective advance rate at closing will be approximately 35.8%[5].

All loans will contain cross-default and cross-collateralization provisions.

GABF supports these transactions based on:
(i)     The appraised and insured value of the Special Collection and the FL NewCo Inventory;
(ii)    The additional collateral in the form of two discrete $30.0 million pools of jewelry ($60.0 million in aggregate) valued at wholesale cost;
(iii)   The implied advance rates of 47.4% and 35.8% for the Special Collection Loan and the Acquisition Loan, respectively[6];
(iv)    The formidable wholesale business of REI;
(v)     The full-recourse guarantees provided by Esmerian and REI;
(vi)    A weighted-average margin of between 400-450 bps;
(vii)   The strategic value created by joining high-end jewelry wholesale (inventory) and retail operations (distribution);
(viii)  The historic cashflows of FL Ltd. and forecasted cashflows of FL NewCo, and;
(ix)    The strength of FL Ltd.'s brand equity.

Following are GABF's expectations relating to fees and revenue that Merrill Lynch will earn over the course of the next three years:

| Description | Special Collection Loan | Acquisition Loan | Revolver | Total |
|---|---|---|---|---|
| Structuring and Financing Fees | $1,200,000 [1] | $1,650,000 [2] | $500,000 [3] | $3,350,000 |
| Facility Net Interest Income (Year 1) | $2,700,000 [4] [7] | $4,125,000 [5] [7] | $480,000 [6] [7] | $7,305,000 |
| Total Fees to Merrill Lynch (Year 1) | $3,900,000 | $5,775,000 | $980,000 | $10,655,000 |
| Total Fees to Merrill Lynch (Over 3 Years, Net of Warrants) | $7,275,000 [7] [8] | $14,025,000 [7] [9] | $980,000 [7] [10] | $22,280,000 |

(1) $60,000,000 Facility size multiplied by 2.00%.
(2) $110,000,000 Facility size multiplied by 1.50%.
(3) $25,000,000 Facility size multiplied by 2.00%.
(4) Assumes full $60 million is outstanding for the first year with a margin of 4.50%.
(5) Assumes full $110 million is outstanding for the first year with a margin of 3.75%.
(6) Assumes average facility size and spread expected to be $6,000,000 and 8.00%, respectively.
(7) Merrill Lynch cost of funds expected to be 1-Month LIBOR.
(8) Assumes an average outstanding balance of $45 million for three years with a margin of 4.50% and is inclusive of Structuring and Financing Fees.
(9) Assumes an average outstanding balance of $110 million for all three years with a margin of 3.75% and is inclusive of Structuring and Financing Fees.
(10) Assumes average facility size of $6 million for the first year and zero thereafter with a margin of 8.00% and is inclusive of Structuring and Financing Fees.

---

[5] Contemplates the $110.0 million Acquisition Term Loan and $6.0 million of Revolver drawn down at closing; implied retail value of the negative pledged jewels is $93.8 million..
[6] The implied advance rates are based against wholesale/auction value and retail value for the Special Collection Loan and Acquisition Loan, respectively.

CONFIDENTIAL ML0034409

Following is a summary of terms for the Facilities:

| | Special Collection Loan | Acquisition Term Loan | Revolver |
|---|---|---|---|
| Facility Term | 3 years if the Acquisition Loan is not consummated, or equal to the term of the Acquisition Loan | 3 years, with two 1-year extensions (at Merrill's discretion) | Equal to the term of the Acquisition Loan |
| Lender | MLCFC | MLCFC | MLCFC |
| Borrowers | Ralph Esmerian LLC | FL NewCo | FL NewCo |
| Guarantor | Esmerian; REI | Esmerian; REI | Esmerian; REI |
| Facility Size | $60.0 million | $110.0 million | Up to $25.0 million |
| Stated Advance Rate/ Effective Advance Rate[1] | 70.0% Loan-to-Auction Value / 47.4% Loan-to-Auction Value | 60.0% Loan-to-Retail Value / 35.8% Loan-to-Retail Value | 60.0% of Excess Availability[2] |
| Borrowing Base | - The borrowing base will be reduced by the appraisal value of each respective piece as it is sold | - The borrowing base will be reduced by the retail amount for each piece sold<br>- The inventory will be re-appraised annually at which point the borrowing base will be fortified, or the loan will be amortized such that the borrowing base will be equal to the appraised value | - The Excess Availability will be dependent upon the borrowing base of the Acquisition Term Loan |
| Facility Funded Rate | L + 4.50% (7.00% if an event of default is occuring)[3] | L + 3.75% (6.25% if an event of default is occuring) | L + 8.00% (10.50% if an event of default is occuring) |
| Facility Fee (paid on closing) | 2.00% of the Maximum Aggregate Amount to be paid at closing | 1.50% of the Maximum Aggregate Amount to be paid at closing | 2.00% of the Maximum Aggregate Amount to be paid at closing |
| Events of Default | - Payment Default<br>- Default in the performance or breach of any representation, Warranty or covenant<br>- Material adverse change in the business, operations or assets<br>- Death or incapacity of Esmerian | - Payment Default<br>- Change of control<br>- Default in the performance or breach of any representation, Warranty or covenant<br>- Material adverse change in the business, operations or assets<br>- Death or incapacity of Esmerian | - Payment Default<br>- Change of control<br>- Default in the performance or breach of any representation, Warranty or covenant<br>- Material adverse change in the business, operations or assets<br>- Death or incapacity of Esmerian |
| Security | - $89.2 million of jewels appraised at wholesale/auction value<br>- $30.0 million of jewels valued at wholesale cost | - $230.0 million of FL NewCo inventory appraised at retail value<br>- $30.0 million of jewels valued at wholesale cost[4] | - Excess Availability of Acquisition Loan collateral and Special Collection Loan collateral |
| Other | N/A | - Warrants for 12.0% of FL NewCo Common Membership Units<br>- 6-month prefunded interest reserve<br>- $10mm in Preferred Equity contributions per annum | N/A |
| Rapid Amortization Event | N/A | - A failure of FL NewCo to maintain a DSCR[5] of at least [TBD] | - A failure of FL NewCo to maintain a DSCR[5] of at least [TBD] |
| Hedge | N/A | - Interest Rate Cap at a 1:1 DSCR[6] | N/A |

(1)  For the Special Collection, the effective advance rate is calculated by dividing the loan amount by the wholesale/auction value of the Special Collection plus the implied wholesale value of the negative pledged jewelry.  For the Acquisition Loan, the effective advance rate is calculated by dividing the loan amount of the retail value of the Inventory plus the implied retail value of the negative pledged jewelry.
(2)  Excess Availability shall be defined as the borrowing base of the Acquisition Term Loan less the aggregate amount outstanding on that facility.
(3)  The margin will be 5.00% until the Acquisition Loan closes, at which point the margin shall be reduced to 4.50% (7.00% if an event of default is occuring).
(4)  The $30.0 million Acquisition Loan negative pledge shall terminate when the outstanding principal balance of the Acquisition Loan has been reduced below $75 million.
(5)  DSCR shall be defined as FL NewCo EBITDA divided by total Debt Service.
(6)  Not required to close.

-3-

CONFIDENTIAL  ML0034410

## II. Relevant Parties Overview

### Ralph Esmerian and R. Esmerian Inc.

Ralph Esmerian is a fourth generation dealer in colored gemstones. R. Esmerian Inc. was incorporated in 1940 when Esmerian's father moved the family from Paris to New York. Esmerian's great-grandfather started the business in Constantinople, and his grandfather moved it to Paris in the late nineteenth century. From the same office in Rockefeller Center since 1954, Esmerian carries on the family tradition of creating and supplying outstanding jewelry and gem quality stones to the world's finest retail jewelers including Cartier, Boucheron, Van Cleef & Arpels, Neiman Marcus, Tiffany & Co and Fred Leighton.

Although REI is the leading wholesaler in the colored stone market, it remains a simple business, having carved its reputation and top-of-mind presence among retailers over the past 65 years. REI is a lapidary (i.e., a stonecutter) and wholesaler of precious and semi-precious colored stones (e.g., emeralds, rubies, sapphires, etc.). The majority of REI's sales, which range between $10.0-$12.0 million per year, are of finished pieces that it designed and created from loose stones. REI also sells finished pieces that it has purchased, as well as loose stones themselves. Most of REI's product is sold on a consignment basis at the world's leading jewelry and high-end retailers. REI will also sell to select private clients and dealers on a limited basis. All of REI's pieces are of the highest quality and, in some cases, of cultural and historical significance as well; a good example is the 62-carat Rockefeller Sapphire that REI sold through Tiffany & Co. in 1991.

Esmerian was born in 1940 in Paris immediately before his family moved to New York. He is the youngest of three siblings, and the only one to enter the family business. After graduating Princeton in 1962, he had ambitions of becoming a city planner and began attending graduate school at New York University. However, after agreeing to assist his father in winding down REI in 1964 to prepare for his retirement, Esmerian realized he had a passion for the business. In 1976, upon his father's death, Esmerian assumed control of REI. In addition to maintaining REI's position as the leading colored gem wholesaler, Ralph has achieved success in other related philanthropic and not-for-profit endeavors. Esmerian is a frequent lecturer at museums such as The Metropolitan Museum of Art and The Cooper Hewitt Museum, is the author of several publications on jewelry, has held the positions of President and Chairman of the Museum of American Folk Art since 1977, is the Vice Chairman of the National Jewelry Institute, and has loaned jewelry to over 10 major jewelry exhibitions since 1987.

### Fred Leighton ("Leighton") and FL Ltd.

Murray Mondschein began his career as a small retail merchant on the Lower East Side selling Mexican wedding dresses and Native American jewelry. Mondschein moved his business to Midtown where his business grew, and he began to sell some smaller estate and antique jewelry. In the early seventies, Esmerian spotted the store and admired Mondschein's taste in jewelry. Esmerian began consigning jewels with him, which became the foundation of Mondschein's jewelry business. Mondschein subsequently purchased the trade name "Fred Leighton" in the mid-eighties from an existing jeweler. Mondschein legally changed his name to Fred Leighton to match the name of the business.

Over the years, FL Ltd. evolved into a high-end retailer specializing in antique and estate jewelry and in the mid-nineties, Leighton opened up a store in Las Vegas in the Bellagio. FL Ltd. currently has approximately $95 million in inventory, which is comprised of pieces that sell for between $10,000 and $2 million dollars. The average retail price for a single item in FL Ltd. is between $10,000 and $100,000. Leighton currently stocks his inventory with purchases from auctions and private sales as well as with pieces that he designs and has manufactured for him. The majority of antique and estate jewelry that Leighton purchases are sold in private sales by people who enter the store specifically to sell their pieces to him.

FL Ltd. has also built up relationships with dozens of celebrities over time. Leighton's reputation as a "jeweler to the stars" has been solidified by his ability to pick the perfect piece out for each celebrity. His jewelry can be seen at all the Hollywood events including the Oscars, the Emmys and the Golden Globe Awards.

Leighton, in his mid-seventies, is a motivated seller who is looking to ease into retirement. Over a year ago, he engaged in extensive conversations with a financial buyer to sell the business. Because of the inventory-intensive nature of the business, the financial buyer ultimately could not meet Leighton's price, and conversations were terminated. During this process, Leighton's accountant discovered an inventory valuation discrepancy that had created a significant tax liability. Leighton approached the IRS and has negotiated a settlement. No legal action has

CONFIDENTIAL ML0034411

been brought by the IRS and none is pending. The proceeds from the Acquisition Term Loan will, in part, be paid directly to the IRS to settle Leighton's liability.

It should be disclosed that Leighton was involved in a sweeping sales tax investigation of New York City retailers by the Manhattan District Attorney's office. In January 2005, FL Ltd. pleaded guilty to one felony count of falsification of business records; he paid $1.0 million in fines and tax restitution. Because Esmerian has structured the acquisition as an asset purchase, there is no liability inherited by FL NewCo.

## III. Transaction Overview

Special Collection Loan



GABF seeks approval for the proposed $60.0 million Special Collection Loan that will be secured by 1) the Special Collection appraised at a wholesale/auction value of $89.2 million, 2) scheduled and negative pledged Special Collection REI Specified Jewelry valued at a wholesale cost of $30.0 million, 3) full recourse guarantees from Ralph Esmerian LLC and REI, and; 4) a full-recourse personal guarantee from Ralph Esmerian. The anticipated closing date is October 31, 2005.

The Special Collection is comprised of 101 individually scheduled pieces ranging in cost from $50,000 to $14,000,000; the aggregate wholesale/auction value is appraised at $89.2 million and is insured by Lloyd's at this value. The Special Collection is comprised of important pieces of jewelry by Faberge, Van Cleef & Arpels, Cartier, Lalique, and Boucheron. An important piece is defined as museum-quality and/or historically significant, such as The Taj Majal Emerald (dating from 1630-1650) and The French Crown Jewels (dating back to 1855). Merrill will have a fully-perfected first priority security interest in each of these pieces established by a Security Agreement and UCC-1 filings; Merrill intends to keep the Provenance Folders with original documents under the stewardship of a third-party custodian. Additionally, the Special Collection Specified REI Jewels, valued at not less than $30.0 million wholesale cost, will be scheduled and subject to a negative pledge holding them free and clear of any third-party liens; UCC-1 filings will also be made for these jewels. Further, full-recourse guarantees will be provided by Ralph Esmerian LLC, REI and Ralph Esmerian, and their respective debts will be scheduled along with a negative covenant limiting their total indebtedness. The Special Collection Loan will contain cross-collateral and cross-default provisions to other Merrill Lynch transactions with Ralph Esmerian LLC, Esmerian, FL NewCo, and their affiliates.

-5-

CONFIDENTIAL ML0034412

Currently, the Special Collection is kept in a vault at the JPMorgan Chase 11 West 51st Street location in Manhattan. Merrill Lynch is working with Ralph Esmerian LLC and Brinks Incorporated ("Brinks") to establish commercially practical controls for the custodial care of the Special Collection that will include 1) storage in a Brinks vault, 2) the scheduled storage of each piece on a "sealed said to contain" basis, and 3) access to the vault limited only to Brinks. Esmerian would require permission from Merrill to access specific pieces that Brinks would carry from the vault to a controlled room at the Brinks location. If these Brinks procedures cannot be finalized, the fall-back position is to store $60.0 million of the Special Collection in a vault controlled by and with access limited only to Merrill Lynch.

The proposed Special Collection Loan is initially priced at 1-month LIBOR + 5.00%, but the margin will decrease to 4.50% upon execution of the Acquisition Loan which is anticipated to close no later than November 30, 2005. This pricing reflects the inherent value of the Special Collection as well as the advance rate, but is structured to protect Merrill Lynch in the event of non-payment by Ralph Esmerian LLC. Merrill Lynch will advance 70.0% of the Special Collection's wholesale/auction value, which has been appraised at $89.2 million. However, with the advance capped at $60.0 million, the effective advance rate is 67.3%. This is further reduced when contemplating the Special Collection REI Specified Jewelry, which will be scheduled at no less than $30.0 million *wholesale cost*. The implied wholesale value effective advance rate is 47.4%. The Special Collection Loan does not have scheduled amortization, however the loan must be prepaid whenever a Special Collection piece is sold; this prepayment amount will be no less than 70% of the appraised value of the respective piece (the appraised value times the advance rate). If a piece from the Special Collection REI Specified Jewelry is sold, it must be substituted with a piece of equal value and quality. Merrill Lynch retains the right to conduct a physical inventory of both collections at least semi-annually and re-appraise and mark-to-market the Special Collection annually during the 3-year term at Esmerian's cost, or more frequently as determined and paid for by Merrill Lynch. Monthly Borrowing Base Certificates will be provided and, in the event that the Special Collection re-appraisal is lower than the original appraisal, Esmerian will have to pay down part of the Special Collection Loan.

The proceeds of the Special Collection Loan will be split evenly among Esmerian and his siblings and/or siblings' heirs; Esmerian is expected to retain $20.0 million of the proceeds. Esmerian anticipates selling the Special Collection on a piecemeal basis over the 3-5 year period subsequent to the closing using FL NewCo as his primary sales channel; private sales to individuals and museums are contemplated also. FL NewCo is the preferred channel as the Special Collection pieces will generate desirable publicity for the store, as well as providing a retail price point which is normally higher than auction values.

Acquisition Loan



CONFIDENTIAL ML0034413

In addition to the Special Collection Loan, GABF seeks approval for the proposed Acquisition Loan which is comprised of a $110.0 million Acquisition Term Loan and up to a $25.0 million Revolver. The Acquisition Loan will be secured by 1) Inventory with an expected appraised retail value of $230.0 million, 2) scheduled and negative pledged Acquisition Loan REI Specified Jewelry valued at a *wholesale cost* of $30.0 million, 3) the annual contribution of $10.0 million of Inventory at wholesale value each year for 3 years (contributed as preferred membership units), 4) full recourse guarantees from Ralph Esmerian LLC and REI, 5) a full-recourse personal guarantee from Ralph Esmerian, 6) a pledge of all outstanding common and preferred membership units of FL NewCo, 7) a fully perfected first priority security interest in the gross operating revenue from Newco, and 8) a security interest in Esmerian's rights under the acquisition documents for the acquisition of FL Ltd. The Acquisition Loan does not have scheduled amortization. The anticipated closing date is November 30, 2005.

The Inventory is comprised of approximately 11,000 pieces and is expected to have a retail value of $230.0 million; the appraisal is currently being conducted by Sotheby's (NYSE: BID, rated B1/BB by Moody's/S&P respectively). Individual inventory pieces range in price from $10,000 to $2,000,000 and are mostly rare antique and estate jewelry. Merrill will have 1) a fully perfected first priority security interest in the Inventory established by a Security Agreement, and 2) a UCC-1 filing for the Inventory; Merrill intends to keep the Provenance Folders with original documents under the stewardship of a third-party custodian. The Acquisition Loan Specified REI Jewels, valued at not less than $30.0 million wholesale cost, will be scheduled and subject to a negative pledge holding them free and clear of any third-party liens; UCC-1 filings will also be made for these jewels. As with the Special Collection Loan, full-recourse guarantees will be provided by REI and Esmerian, and their respective debts will be scheduled along with a negative covenant limiting their total indebtedness. Further, Esmerian will annually contribute not less than $10.0 million of additional Inventory (valued at wholesale) to FL NewCo during the first three years; these contributions will be treated as preferred membership unit investments, and Merrill will have the identical security interests as with the existing Inventory. Merrill will also be granted 5-year putable warrants for 12.0% of FL NewCo's fully diluted (as of the closing date) common membership units at a strike price of $0.01 per unit.

Esmerian has also agreed to establish a 6-month fully-funded Interest Reserve to be funded outside of FL NewCo at closing. The Interest Reserve will be held in an escrow account bearing interest for Esmerian and will be released when the Debt Service Coverage Ratio reaches a to-be-negotiated threshold, which is likely to be in the range of 1.50x-2.00x. In addition, REI shall at all times following the first anniversary of the closing of the Acquisition Loan maintain at least $30.0 million in retail appraised value of jewelry on consignment with FL NewCo (which may include Acquisition Loan Specified REI Jewelry)[7]. The Acquisition Loan will contain cross-collateral and cross-default provisions to other Merrill Lynch transactions with Ralph Esmerian LLC, Esmerian, or FL NewCo or its affiliates.

The Inventory is stored on location at both FL Ltd. stores (i.e., New York and Las Vegas). The majority of the Inventory is displayed at the stores, so it is set up and taken down daily. While on display, the Inventory is behind secure cases with keyless entry that monitors the identity of the persons who open each case and the time at which it was opened. During non-business hours, the Inventory is stored in a vault below ground. Merrill Lynch has visited the New York location and viewed the business hour and non-business hour procedures, including a vault walk-through. Merrill intends to visit the Las Vegas store prior to the Acquisition Loan closing.

The Acquisition Loan is priced at 1-Month LIBOR + 3.75%, and the Revolver is priced at 1-Month LIBOR + 8.00%. Both facilities are secured by the same collateral, however the Revolver is additive to the advanced amount (i.e., $110.0 million) and, as a result, is priced like a mezzanine tranche. The Acquisition Term Loan Loan-to-Value ("LTV") is 60.0% of the Inventory's retail value, the appraised retail value of which is expected to be $230.0 million. However, with the advance capped at $110.0 million, the effective advance rate is 47.8%. This is further reduced when contemplating the Acquisition Loan REI Specified Jewelry, which will be scheduled at no less than $30.0 million *wholesale cost*. Given the implied retail value of this discrete pool, the effective advance rate is 35.8%.

Merrill will also provide a Revolver for working capital purposes, which is limited to $25.0 million. The Revolver availability is based upon the gap between the stated LTV Amount and the actual advance of $110.0 million (the "LTV Cushion"). In the expected scenario, the LTV Amount is $138.0 million (60.0% x $230.0 million), leaving an LTV Cushion of $28.0 million. The Revolver LTV is 60.0%, giving FL Newco the capability of drawing $16.8 million (60.0% x $28.0 million); this would still leave $103.2 million of excess Inventory collateral if the Revolver

---

[7] *All jewelry consigned with FL NewCo will be subject to a minimum net sale proceeds margin of 50.0%.*

-7-

CONFIDENTIAL ML0034414

was fully drawn. The Revolver can be drawn upon for up to $25.0 million as long as the Inventory retail value can support this amount. Please refer to the chart below for a graphic demonstration of the availability mechanic.



The Acquisition Loan does not have scheduled amortization. But note, while not required, Esmerian has expressed an intent to pay down the Acquisition Loan by approximately $10 million per year. If a piece from the Acquisition Loan REI Specified Jewelry is sold, it must be substituted with a piece of equal value and quality. Merrill Lynch retains the right to conduct semi-annual physical inventory counts and annual re-appraisals to mark-to-market the Inventory, and a Borrowing Base Certificate will be provided on a monthly basis. In the interim months between re-appraisals, a retail valuation mechanic (please see Exhibit 5 for detail) would be used to determine the Inventory's retail value. Events of default relating to Inventory valuation are outlined in Exhibit 5 and can be cured by an appropriate pay-down of the Acquisition Loan or the addition of acceptable collateral in the Inventory.

CONFIDENTIAL  ML0034415

## IV. Financial Projections (Fred Leighton NewCo)

Merrill Lynch has created a flexible model that has the capability of illustrating the performance of the business under many different scenarios. Seen below is FL NewCo's performance under three scenarios: the Expected Scenario, the Base Case Scenario, and the Stressed Scenario. The Expected Scenario includes the expansion of the Fred Leighton footprint, with the opening of four new stores: one in Beverly Hills, CA; one in Palm Beach, FL; one in Las Vegas, NV; and one in Moscow (extremely preliminary). This scenario uses conservative assumptions for the performance of the new stores as well as the existing stores. These assumptions include same-store sales growth of approximately 5% a year and same store SG&A growth of approximately 3%. The strong growth in total sales under this scenario is attributed to Esmerian's consignment of all Inventory necessary for the opening of new stores. This effectively enables the business to begin operating new stores without the cash outflow for Inventory that would otherwise be necessary for this type of expansion.

The Base Case Scenario includes only the existing stores and uses slightly more conservative assumptions for existing store performance than the Expected Scenario. These assumptions include same-store sales growth of 5% only in year one with flat sales in subsequent years. The SG&A still increases by approximately 3% each year. The Stressed Scenario uses only the existing stores, and contemplates no sales growth over the three years as well as approximately 3% of SG&A growth. The debt service is covered in all three scenarios.

*Projections (Expected Scenario):*

| | Projected Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | Year 1 | Year 2 | Year 3 |
| Sales | $53,657,400 | $89,058,000 | $113,027,400 |
| *Y-o-Y Sales Growth* | *NA* | *65.98%* | *26.91%* |
| Gross Profit | 23,360,620 | 38,206,960 | 48,489,420 |
| *Gross Profit as % of Sales* | *43.54%* | *42.90%* | *42.90%* |
| EBITDA | 12,157,720 | 19,608,060 | 24,924,020 |
| *EBITDA as % of Sales* | *22.66%* | *22.02%* | *22.05%* |
| Interest | 8,958,492 | 8,651,559 | 8,107,596 |
| DSCR | 1.36x | 2.27x | 3.07x |

*Projections (Base Case Scenario):*

| | Projected Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | Year 1 | Year 2 | Year 3 |
| Sales | $47,562,600 | $47,992,800 | $48,423,100 |
| *Y-o-Y Sales Growth* | *NA* | *0.90%* | *0.90%* |
| Gross Profit | 20,922,700 | 21,146,500 | 21,370,300 |
| *Gross Profit as % of Sales* | *43.99%* | *44.06%* | *44.13%* |
| EBITDA | 11,056,500 | 10,861,800 | 10,749,800 |
| *EBITDA as % of Sales* | *23.25%* | *22.63%* | *22.20%* |
| Interest | 8,876,274 | 8,522,671 | 8,107,596 |
| DSCR | 1.25x | 1.27x | 1.33x |

*Projections (Stressed Scenario):*

| | Projected Fiscal Year Ended | | |
| --- | --- | --- | --- |
| | Year 1 | Year 2 | Year 3 |
| Sales | $44,888,000 | $44,888,000 | $44,888,000 |
| *Y-o-Y Sales Growth* | *NA* | *0.00%* | *0.00%* |
| Gross Profit | 19,713,600 | 19,713,600 | 19,713,600 |
| *Gross Profit as % of Sales* | *43.92%* | *43.92%* | *43.92%* |
| EBITDA | 10,016,600 | 9,661,400 | 9,389,000 |
| *EBITDA as % of Sales* | *22.32%* | *21.52%* | *20.92%* |
| Interest | 8,931,976 | 8,547,606 | 8,107,596 |
| DSCR | 1.12x | 1.13x | 1.16x |

CONFIDENTIAL ML0034416

## V. Due Diligence

Completed due diligence to date includes:

- Presentations and meetings with Esmerian and his advisors, including regular visits to REI offices;
- Walk-through of the FL Ltd. location on 773 Madison Avenue, including the vault area;
- Meeting with Fred Leighton and his daughter, Mara, both of whom are owners of FL Ltd.;
- Meeting and discussion with Benjamin Zucker regarding the Special Collection appraisal methodology;
- Conference call with Besso International/Lloyd's Broker to discuss their insurance underwriting methodology of the Special Collection;
- Multiple conversations regarding the business plan and detailed assumptions in the business model;
- Call with Sotheby's regarding appraisal methodology.

Due diligence in process includes:

- FTI Consultants, our forensic accountants, are currently at FL Ltd. conducting work in the following areas:
    - o Quality of earnings;
    - o Inventory controls;
    - o General systems, reporting and controls;
    - o Taxes;
- Discussions with Brinks regarding physical security and custodial stewardship of the Special Collection;
- Background checks on Esmerian and Fred Leighton ordered through Kroll and IBR;
- Identifying senior officer candidates (CEO/CFO)

Due diligence to be performed prior to the Acquisition Loan closing includes:

- Walk-through of the FL Ltd. Las Vegas store;
- Walk-through of expected location for the Beverly Hills store;
- Discussion with Sotheby's regarding their Inventory appraisal methodology;
- Physical count of FL Ltd. Inventory;
    REDACTED
- Analysis of IBR and Kroll background reports; and
    REDACTED

-10-

CONFIDENTIAL ML0034417

## VI. Risks and Mitigating Factors

### Risks

**Appraisal Risk**
Given the unique nature of the pieces that comprise the Special Collection and Inventory, and the lack of transparency in the wholesale, private sale, auction and retail markets, the appraisal methodologies involve a certain degree of subjectivity. It is possible that if the collateral were to be sold in an orderly liquidation scenario, the realized values could fall below appraised values.

**Collateral Risk**
The Collateral is comprised of small jewelry pieces that are valuable, transportable and fungible. There is a risk that safeguard controls could be compromised by an employee or principal and that the collateral base could be impaired.

**Market Risk**
Both loans are based upon variable-rates and 1-Month LIBOR has been trending upwards over the past 15 months. FL NewCo's ability to service its debt could be impaired if 1-Month LIBOR rates reach certain thresholds.

**Execution Risk**
FL NewCo is executing on a strategic plan to extend the Fred Leighton brand domestically and abroad by opening new locations. The opening of each store requires $1.0 million to $3.0 million of capital investment for the leasehold improvements. If the new stores fail to break even within a certain timeframe, it could strain the cash flows of the business and impair its ability to service the debt.

**Management Risk**
FL NewCo intends to hire a new CEO and CFO. If there is a delay in hiring one of these executives or their performance falls below expectations, it could have an unfavorable impact on the performance of the business.

**Industry Risk**
We are confident that FL NewCo can withstand an economic downturn, as we view their business model as non-cyclical. Supply in the antique and estate jewelry market is very limited, and demand remains fairly steady among the world's upper classes. It is possible, albeit unlikely, that there could be a depression in the prices of diamonds and colored stones which could affect Newco's inventory prices. However, given the rare and historical nature of many of the pieces, we feel it is unlikely that their market values would be significantly affected.

### Mitigants

**Excess Collateral**
Both loans are secured by excess collateral beyond the primary collateral bases. The Special Collection Loan and the Acquisition Loan are collateralized with $89.2 million and $230.0 million of appraised value jewels, respectively. Beyond that, each loan is supported by an additional $30.0 million *each* of jewels valued at wholesale cost, which has an estimated minimum retail value of $75.0 million each. Additionally, for each of the first 3 years, the Acquisition Loan will be bolstered by an annual $10.0 million Inventory contribution to FL NewCo by Esmerian which will be captured as collateral. Further protection is provided by a 6-month interest reserve for the Acquisition Loan. Both loans will contain cross-default and cross-collateralization mechanisms. Esmerian and his wholesale business, REI, will provide full-recourse guarantees for both loans also.

**Physical Security**
The Special Collection will be housed in a vault with access limited to Merrill and Esmerian. Merrill intends to establish a third-party custodial relationship with Brinks to schedule and monitor the individual pieces. Controls will be installed to limit the value and number of pieces that can be accessed at at one time. In the event that a custodial relationship cannot be established, Merrill retains the right to secure the Special Collection in a dedicated vault to which only Merrill has access.

The Inventory is stored in a vault on the premises of each store. Because the Inventory is set up and taken down from display on a daily basis, there is the opportunity for slippage, however this will be substantially mitigated by periodic physical counts and controls, satisfactory to Merrill Lynch, that will be instituted by FTI Consulting, a vendor that Merrill Lynch selected.

-11-

CONFIDENTIAL ML0034418

#### Capital Markets Products

Merrill Lynch will be working with Esmerian to provide capital markets solutions to mitigate the impact of rate increases. By conducting analyses on behalf of the client to price appropriate rate cap products, Merrill will ensure that FL NewCo does not impair its cash flow and avoids Payment Default or violating a Debt Service covenant due to interest rate increases.

#### Inventory Contributions

Unlike other retail jewelry operations, the inventory to fuel FL NewCo's growth will be contributed by Esmerian. This eliminates a huge capital constraint that binds most of its competitors. By limiting the capital investment of a new store to leasehold improvements, the breakeven is accelerated and the profitability is substantially enhanced. Merrill Lynch views this integration of wholesale and retail operations as a meaningful competitive advantage.

#### Transition of Existing Management

To facilitate a smooth transition, Fred Leighton and Mara Leighton will remain with FL NewCo for at least a full year in their current capacities; it is likely that Fred Leighton will remain for two years. This will provide FL NewCo with the time to hire the right executives for the positions of CEO and CFO, as well as allow for an orderly transfer of knowledge.

#### Historical Performance

FL Ltd. and REI have been in business for over 35 years and over 65 years respectively. Over this time, both businesses have performed through a variety of economic conditions and have continued to grow their inventories of rare jewels of exceptional quality. Merrill Lynch is confident that both FL Ltd. and Esmerian through REI will continue to thrive in any economic scenario.

#### Insurance

Lloyds will underwrite all risk insurance policies for both the Special Collection and the Inventory. Merrill Lynch will be listed as a lender loss payee on both policies.

CONFIDENTIAL ML0034419

Distribution:
B.   Alder
L.   Applebaum
C.   Ashley
S.   Cadenhead
T.   Chitwattanagorn
M.   Colborn
C.   Czako
J.   Janover
J.   Lane
R.   Lu
J.   Magnus
M.   McGovern
M.   McInerney
D.   Morley
G.   Nagotko
I.   Shtogrin
M.   Taub
K.   Telikepali
P.   Tufaro
C.   Vendome
B.   Weisberg
P.   Wood

Cc:
J.   Kronthal
E.   Moriarty
M.   Blum
J.   Schulz
J.   Swabda

CONFIDENTIAL ML0034420

## APPENDICES

FL Ltd. Historical Financials ................................................................................................ 1

Collateral Package Diagram ............................................................................................... 2

Appraisal/Insurance of the Special Collection ................................................................. 3

CV of Benjamin Zucker ..................................................................................................... 4

Borrowing Base Mechanic ................................................................................................ 5

Acquisition Letter of Intent ............................................................................................... 6

CV of Ralph Esmerian ...................................................................................................... 7

CONFIDENTIAL  ML0034421

Financial Information (FL Ltd. Historical)

Income Statement

| | Full Year Ended | | |
| --- | --- | --- | --- |
| | December 31, 2002 | December 31, 2003 | December 31, 2004 |
| Sales | $27,825,073 | $38,594,644 | $44,887,895 |
| Cost of Goods Sold | 15,462,465 | 21,404,531 | 27,535,841 |
| **Gross Profit** | 12,362,608 | 17,190,113 | 17,352,054 |
| Operating Expenses | | | |
| Selling expenses | 5,618,652 | 6,464,003 | 8,815,475 |
| General and administrative expenses | 1,628,187 | 1,645,244 | 2,011,747 |
| **Total Operating Expenses** | 7,246,839 | 8,109,247 | 10,827,222 |
| **Income from Operations** | 5,115,769 | 9,080,866 | 6,524,832 |
| **Total Other Income (Expense)** | (242,039) | (1,059,858) | (210,640) |
| **Income Before Provision for Income Taxes** | 4,873,730 | 8,021,008 | 6,314,192 |
| Provision for income taxes | | | |
| Current | (57,152) | (221,857) | (1,125,763) |
| Deferred | (214,186) | (195,085) | – |
| **Net Income** | $4,602,392 | $7,604,066 | $5,188,429 |

*Balance Sheet*

| | December 31, 2002 | December 31, 2003 | December 31, 2004 |
| --- | --- | --- | --- |
| Assets | | | |
| Cash | $144,831 | $389,719 | $118,788 |
| Accounts Receivable | 2,451,331 | 3,654,939 | 5,992,127 |
| Loans receivable, customers, non-interest bearing | 87,718 | 85,317 | 95,798 |
| Inventory | 83,008,765 | 93,470,820 | 94,360,279 |
| Prepaid income taxes and expenses | 162,935 | 301,630 | 278,708 |
| **Total Current Assets** | 85,855,580 | 97,902,425 | 100,845,700 |
| Property and Equipment – Net | 3,074,181 | 3,039,669 | 2,662,106 |
| Other Assets – Security deposits and other assets | 282,541 | 281,340 | 303,205 |
| **Total Assets** | $89,212,302 | $101,223,434 | $103,811,011 |
| Liabilities and Equity | | | |
| Notes payable, bank | $3,350,000 | $1,500,000 | $6,832,894 |
| Current portion of long-term debt | 304,368 | 606,435 | 6,634 |
| Accounts payable and accrued expenses | 9,081,277 | 14,418,072 | 10,405,839 |
| Income taxes payable | 10,081 | 164,669 | 1,108,915 |
| Sales tax payable | | 277,154 | 47,308 |
| Deferred income taxes | 214,186 | 409,271 | – |
| **Total Current Liabilities** | 12,959,912 | 17,375,601 | 18,401,590 |
| Long-term debt, less current portion | 1,145,548 | 1,862,949 | 281,278 |
| **Total Liabilities** | 14,105,460 | 19,238,550 | 18,682,868 |
| Equity | 75,106,842 | 81,984,884 | 85,128,143 |
| **Total Liabilities & Equity** | $89,212,302 | $101,223,434 | $103,811,011 |

CONFIDENTIAL ML0034422

## Exhibit 5: Borrowing Base Mechanic

### Borrowing Base Re-Valuation Methodology

**Inventory Re-Appraisal:**  Annually

**Interim Borrowing Base Certification:** [8]  Monthly

**Methodology:**  An Initial LTV Amount will be established for the Inventory. The Initial LTV Amount will be calculated as follows:

<u>Initial LTV Amount = LTV Ratio x Initial Appraised Value</u>

Through a monthly Borrowing Base Certification process, a Current LTV Amount will be calculated as follows:

<u>Current LTV Amount = LTV Ratio x Current Appraised Value</u> [9]

The Current Appraised Value will be determined annually through a formal appraisal process for the Inventory. In the interim on a monthly basis, the Current Appraised Value of the Inventory will be determined as follows:

- The Inventory will be segregated into Existing Inventory and New Inventory. The retail value for Existing Inventory at closing will be its Initial Appraised Value. The retail value for New Inventory as it is purchased will be determined as follows: <u>(New Inventory Cost)/(1 – Trailing-Twelve-Month Gross Profit Margin).</u>

- As sales are made from the Existing Inventory, the actual retail value of these sales will be deducted from its Initial Appraised Value to determine its Current Appraised Value. As sales are made from the New Inventory, the actual retail value of these sales will be deducted from the New Inventory retail value (as determined by the above formula) to determine its Current Appraised Value.

- The retail value of all Inventory will be reset upon the appraisal thereof.

An Event of Default will exist if the Current LTV Amount for the Inventory drops below the Initial LTV Amount. This Event of Default can be cured through one or both of the following:

- replacement of acceptable collateral sufficient to bring the Current LTV Amount at or above the Initial LTV Amount, and/or;

- pay-down of principal sufficient to restore the LTV cushion, which is defined as the dollar-amount difference between the Initial LTV Amount and the Loan Amount.

---

[8] *Inclusive of Collateral for Acquisition Loan, Special Collection and Revolver*
[9] *Current Appraised Value represents either the periodic Appraisal Value or the monthly estimated value*

**CONFIDENTIAL   ML0034423**

New York, New York 10080

Telephone:  212.449.7952
Fax:        212.449.6673

Josh Green
Vice President

 **Merrill Lynch**

November 2, 2005

STRICTLY CONFIDENTIAL

Jeff Harwin
Merrill Lynch Pierce, Fenner & Smith, Inc.
222 Broadway, Floor 14
New York, NY 10038

Re:  <u>Project Nile: Representation of Possession of Itemized Appraisal</u>

Dear Jeff:

    I am writing you to confirm that my group, Global Asset Based Finance, has in its possession an itemized appraisal of all pieces in the Special Collection. The appraisal is dated August 18, 2005 and was performed by Mr. Benjamin Zucker, President of the Precious Stones Company and a highly regarded expert. In determining his replacement insurance appraisal values, Mr. Zucker looked at each piece as an individual piece and as part of the collection as a whole. He examined many characteristics of each piece including quality and condition of the stones, metal, workmanship, the uniqueness of the design, the significance of the jeweler, when signed, and the importance of the piece in relation to the jeweler's reputation and creativity for that style. Mr. Zucker arrived at a final appraisal value for the collection of $89,150,000. Due to our client's concerns about his physical safety, we have agreed to be extremely discrete with any documents which may allude to his personal wealth or the value of any specific collateral. In keeping with this discretion, we are keeping the appraisal in our possession.

Best Regards,

Josh Green

# EXHIBIT 3

| | A | B |
|---|---|---|
| 1 | **PROJECT NILE** | |
| 2 | Financial Model Summary | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | - doesn't make any economic sense as the interest is too high resulting in insufficient cash flow to pay taxes, so revolver take-down |
| 8 | Management Projections w/ $0 Equity | is required which places them further and further into debt |

# EXHIBIT 4



# BESSO LIMITED

Mr Ryan D. Bell,
Vice President
Merrill Lynch Commercial Finance Corp
4 World Financial Center,
10th Floor,
New York NY 10080.

18th August 2005

Dear Mr Bell,

Lloyds Underwriters have quoted an all risks insurance policy with US$89,150,000 of coverage for R. Esmerian Inc's private jewel collection.

To underwrite this policy, Underwriters relied as far as the values are concerned on the appraisal work of Benjamin Zucker, President of the Precious Stones Company. They consider Mr Zucker to be among the world's foremost jewelry appraisers. His methodology for appraising the SPECIAL JEWELRY COLLECTION formed the basis on which the policy is being written, and they have full confidence that Mr Zucker's appraisal represents the true market value of this collection.

Please feel free to call me on 0044-207-480-1098 with any questions.

Yours sincerely,

Alastair Pinney
Divisional Director
Besso International Ltd

INTERNATIONAL DIVISION
BESSO LIMITED
A SUBSIDIARY OF BESSO HOLDINGS LIMITED
8-11 CRESCENT, LONDON EC3N 8LY
TELEPHONE: 020 7480 1000, FACSIMILE: 020 7480 1277
WEBSITE: www.besso.co.uk
AUTHORISED AND REGULATED BY THE FINANCIAL SERVICES AUTHORITY, FSA FIRM REFERENCE NO. 305181
REGISTERED IN ENGLAND NUMBER 00810866

LLOYD'S

EXHIBIT 5

# United States Bankruptcy Court
## Southern District of New York

In re _____ _____  Case No. _____

_____ Debtor(s)  Chapter __11__

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [*or chapter 9*] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| J.M. Ullmann Inc.<br>610 Fifth Avenue, Room 414<br>New York, NY 10020 | J.M. Ullmann Inc.<br>610 Fifth Avenue, Room 414<br>New York, NY 10020 | | | 705,000.00 |
| Line Architecture<br>2114 Coldwater Canyon<br>Beverly Hills, CA 90210 | Line Architecture<br>2114 Coldwater Canyon<br>Beverly Hills, CA 90210 | | | 180,000.00 |
| Citysafe INC<br>312 Squankum-Yellowbrook Road<br>Farmingdale, NJ 07727 | Citysafe INC<br>312 Squankum-Yellowbrook Road<br>Farmingdale, NJ 07727 | | | 81,841.75 |
| S.J. Philips, Ltd.<br>139 New Bond Street<br>London, W1A3DL<br>UK | S.J. Philips, Ltd.<br>139 New Bond Street<br>London, W1A3DL<br>UK | | | 69,637.73 |
| FTI Consulting<br>3 Times Square, 11th Floor<br>New York, NY 10036 | FTI Consulting<br>3 Times Square, 11th Floor<br>New York, NY 10036 | | Disputed | 32,788.82 |
| Tanagro Jewelry Corp.<br>5 East 57th Street<br>New York, NY 10022 | Tanagro Jewelry Corp.<br>5 East 57th Street<br>New York, NY 10022 | | | 14,990.00 |
| Overton & Co<br>2016 Linden Bvld<br>Elmont, NY 11003 | Overton & Co<br>2016 Linden Bvld<br>Elmont, NY 11003 | | | 6,841.79 |
| Pro Elevator Services Inc<br>171 West Street<br>Brooklyn, NY 11222 | Pro Elevator Services Inc<br>171 West Street<br>Brooklyn, NY 11222 | | | 5,444.25 |
| Carvin French, INC.<br>515 Madison Avenue<br>Suite 1605<br>New York, NY 10022 | Carvin French, INC.<br>515 Madison Avenue<br>Suite 1605<br>New York, NY 10022 | | | 4,676.00 |
| American Gemological Lab<br>580 Fifth Avenue<br>Suite 706<br>New York, NY 10036 | American Gemological Lab<br>580 Fifth Avenue<br>Suite 706<br>New York, NY 10036 | | | 4,247.50 |

In re _____     Case No. _____
                    Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
(Continuation Sheet)

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| Massa Gioconda<br>Viale Castelluccio, 57-80059<br>Torre Del Greco<br>ITALY | Massa Gioconda<br>Viale Castelluccio, 57-80059<br>Torre Del Greco<br>ITALY | | | 2,900.80 |
| H.E.Glass & CO.<br>509 Madison Avenue, Suite 502<br>New York, NY 10022 | H.E.Glass & CO.<br>509 Madison Avenue, Suite 502<br>New York, NY 10022 | | | 1,635.00 |
| Remco Maintenance LLC.<br>47-30 35th Street<br>Long Island City, NY 11101 | Remco Maintenance LLC.<br>47-30 35th Street<br>Long Island City, NY 11101 | | | 670.09 |
| Flynn's Inc.<br>55 East 59th Street<br>New York, NY 10022 | Flynn's Inc.<br>55 East 59th Street<br>New York, NY 10022 | | | 618.75 |
| North American Packaging<br>140 West 30th Street<br>New York, NY 10001 | North American Packaging<br>140 West 30th Street<br>New York, NY 10001 | | | 615.35 |
| John Shields Detective Bureau<br>60 East 42nd Street<br>New York, NY 10165 | John Shields Detective Bureau<br>60 East 42nd Street<br>New York, NY 10165 | | | 488.59 |
| Daley & Wanzer<br>821 Nantasket Avenue<br>Hull, MA 02045 | Daley & Wanzer<br>821 Nantasket Avenue<br>Hull, MA 02045 | | | 301.40 |
| DJM Maintence Systems Inc.<br>4 Southview Road<br>New Fairfield, CT 06812 | DJM Maintence Systems Inc.<br>4 Southview Road<br>New Fairfield, CT 06812 | | | 281.77 |
| Kassoy LLC<br>101 Commercial St, Suite 200<br>Plainview, NY 11803 | Kassoy LLC<br>101 Commercial St, Suite 200<br>Plainview, NY 11803 | | | 273.06 |
| Watch Service Center<br>10 West 47th Street, Booth 22<br>New York, NY 10036 | Watch Service Center<br>10 West 47th Street, Booth 22<br>New York, NY 10036 | | | 205.00 |

## DECLARATION UNDER PENALTY OF PERJURY
## ON BEHALF OF A CORPORATION OR PARTNERSHIP

I, the Sole Member of Tango, LLC of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date   April 14, 2008 _____        Signature   /s/ Ralph O. Esmerian _____
                                                                    Ralph O. Esmerian

*Penalty for making a false statement or concealing property*:  Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

EXHIBIT 6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                  )   Chapter 11
                     )
FRED LEIGHTON HOLDING, INC., <u>et al</u>,   )   Case No: 08-
          Debtors.          )
------------------------------------------------------------x   )   **EXHIBIT "6"**
                     )

## LIST OF CREDITORS HOLDING 5 LARGEST SECURED CLAIMS

*Following is the list of the debtor's creditors holding the 5 largest secured claims. The list is prepared in accordance with Local Rule 1007-2(a)(4) for filing in this chapter 11 case.*

| | NAME OF CREDITOR AND COMPLETE MAILING ADDRESS (including zip code) | NAME, TELEPHONE NUMBER and COMPLETE MAILING ADDRESS (including zip code) of EMPLOYEE, AGENT, or DEPARTMENT (if different from mailing address) of Creditor Familiar with Claim | AMOUNT OF CLAIM | C * U * D * S * | DESCRIPTION AND EST. VALUE OF COLLATERAL SECURING CLAIM |
|---|---|---|---|---|---|
| 1. | Merrill Lynch Mortgage Capital, Inc., 4 World Financial Center, 12 floor, New York, NY 10080 | Attn: Chase Ashley | Approx: $181,000,000 | D | Jewelry collections Approx: $255,000,000 |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |

\*   C - if claim is contingent; U - if claim is unliquidated; D - if claim is disputed; S - if claim is subject to set off

## DECLARATION UNDER PENALTY OF PERJURY

     I, RALPH O. ESMERIAN, (1) Executive Chairman of the Board of Directors of Fred Leighton Holding, Inc., the parent company of Fred Leighton LLC, Phoenix Nevada 1, LLC and Fred Leighton BH LLC; (2) and managing member of Calypso Mines LLC, Endymion, LLC and Foxtrot LLC; and (3) 65% shareholder of R. Esmerian, Inc. which is the managing member of Tango, LLC, the debtors-in-possession in these cases, declare under penalty of perjury that I have read the foregoing list of creditors holding the five (5) largest secured claims and that it is true and correct to the best of my information and belief.

April 14, 2008                  /s/ Ralph O. Esmerian
                                  Name: Ralph O. Esmerian

EXHIBIT 7

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                          :    Chapter 11
                                                :
FRED LEIGHTON HOLDING, INC., et al.             :    Case Nos.      08-11363
                                                :
                    Debtors.                    :
                                                :    Jointly Administered

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CERTIFICATION

      I hereby certify and declare under penalty of perjury that I have read the attached

and that to the best of my knowledge the matrix/list of creditors filed in this case is complete and

accurate.

Dated:  New York, New York
        April 15, 2008

                                     /s/ Ralph O. Esmerian
                                     Name: Ralph O. Esmerian
                                     Title: Executive Chairman of the Board of Directors

(An individual signing on behalf of a partnership or corporation must indicate position or
relationship to debtor.)

*Penalty for making a false statement:  Fine of up to $500,000 or imprisonment for
up to 5 years, or both. 18 U.S.C. §§ 152 and 3571*

JOSHUA J. ANGEL
HERRICK, FEINSTEIN LLP
2 PARK AVENUE
NEW YORK, NY 10016


OFFICE OF THE US TRUSTEE
33 WHITEHALL STREET
SUITE 2100
NEW YORK, NY 10004


INTERNAL REVENUE SERVICE
SPEC. PROCEDURES FUNCTION
PO BOX 60
BROOKLYN, NY 11201


UNITED STATES ATTORNEY
ATT: CHIEF BANKRUTPCY LIT
ONE PIERREPONT PLAZA
14TH FLOOR
BROOKLYN, NY 11201


US DEPT OF JUSTICE
TAX DIVISION
BOX 55
BEN FRANKLIN STATION
WASHINGTON, DC 20044


NYS DEPT OF TAXATION & FINANCE
BANKRUPTCY SECTION
PO BOX 5300
ALBANY, NY 12205-0300


NYS DEPT. OF TAXATION
QUEENS DISTRICT OFFICE
80-02 KEW GARDENS ROAD
KEW GARDENS, NY 11415


NYS DIVISION OF CORPORATIONS
ALBANY, NY 12231-0002


NYC DEPT OF FINANCE
CHURCH STREET STATION
PO BOX 3671
NEW YORK, NY 10008

NY CITY DEPT. OF FINANCE
BANKRUPTCY & ASSIGNMENT UNIT
345 ADAMS STREET, 10TH FLOOR
BROOKLYN, NY 11201


777 MADISON INVESTMENT ASSOCIA
C/O MITSUI REAL ESTATE SALES
1251 AVENUE OF THE AMERICAS
NEW YORK, NY 10020


AMERICAN GEMOLOGICAL LAB
580 FIFTH AVENUE
SUITE 706
NEW YORK, NY 10036


BELLAGIO
ATTN: VP GENERAL COUNSEL
3550LAS VEGAS BLVD. SOUTH
LAS VEGAS, NV 89109


BELLAGIO
ATTN: SR. VP RETAIL OPERATIONS
3650 LAS VEGAS BLVD. SOUTH
LAS VEGAS, NV 89109


BEVERLY HILLS PROPERTIES III
6425 WEST EXECUTIVE DRIVE
MEQUON, WI 53092


CALIFORNIA FRANCHISE TAX BOARD
P.O.BOX 942840
SACRAMENTO, CA 94240


CALIFORNIA OFFICE OF ATTY GENE
PUBLIC INQUIRY UNIT
P.O.BOX 944255
SACRAMENTO, CA 94244


CARVIN FRENCH, INC.
515 MADISON AVENUE
SUITE 1605
NEW YORK, NY 10022


CITYSAFE INC
312 SQUANKUM-YELLOWBROOK ROAD
FARMINGDALE, NJ 07727

CONNOISSEURS
17 PRESIDENTIAL WAY
WOBURN, MA 01801


D.M. ENGRAVING
18 WEST 56TH STREET
NEW YORK, NY 10019


DALEY & WANZER
821 NANTASKET AVENUE
HULL, MA 02045


DELAWARE DIVISION OF REVENUE
CARVEL STATE OFFICE BUILDING
820 FRENCH STREET, 8TH FLOOR
WILMINGTON, DE 19801


DJM MAINTENCE SYSTEMS INC.
4 SOUTHVIEW ROAD
NEW FAIRFIELD, CT 06812


ELITE COURIERS, INC.
P.O. BOX 912
CANAL STREET STATION
NEW YORK, NY 10013


FLYNN'S INC.
55 EAST 59TH STREET
NEW YORK, NY 10022


FTI CONSULTING
3 TIMES SQUARE, 11TH FLOOR
NEW YORK, NY 10036


H.E.GLASS & CO.
509 MADISON AVENUE, SUITE 502
NEW YORK, NY 10022


INTERNAL REVENUE SERVICE
1111 CONSTITUTION AVENUE, N.W.
WASHINGTON, DC 20224

INTERNAL REVENUE SERVICE
DISTRICT OFFICE
290 BROADWAY
NEW YORK, NY 10007


J.M. ULLMANN INC.
610 FIFTH AVENUE, ROOM 414
NEW YORK, NY 10020


JOHN SHIELDS DETECTIVE BUREAU
60 EAST 42ND STREET
NEW YORK, NY 10165


KASSOY LLC
101 COMMERCIAL ST, SUITE 200
PLAINVIEW, NY 11803


LINE ARCHITECTURE
2114 COLDWATER CANYON
BEVERLY HILLS, CA 90210


MANHATTAN FIRE & SAFETY
242 WEST 30TH STREET, 7TH FLOOR
NEW YORK, NY 10001


MASSA GIOCONDA
VIALE CASTELLUCCIO, 57-80059
TORRE DEL GRECO
ITALY


MERRILL LYNCH MORTGAGE CAPITAL
4 WORLD FINANCIAL CENTER, 12 FL
ATTN: CHASE ASHLEY
NEW YORK, NY 10080


MICHAEL BEST & FRIEDRICH
ATTN: JAMES LEVIN
100 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202


NATIONAL BAG CO., INC
233 OLD MILL ROAD
HUDSON, OH 44236

NEVADA DEPARTMENT OF TAXATION
1550 COLLEGE PARKWAY
SUITE 115
CARSON CITY, NV 89706


NEVADA DEPARTMENT OF TAXATION
555 EAST WASHINGTON STREET
SUITE 1300
LAS VEGAS, NV 89101


NEVADA OFFICE OF ATTORNEY GENE
100 N. CARSON STREET
CARSON CITY, NV 89701


NORTH AMERICAN PACKAGING
140 WEST 30TH STREET
NEW YORK, NY 10001


NYS DEPARTMENT OF TAXATION
W.A. HARRIMAN CAMPUS
ALBANY, NY 12227


NYS OFFICE OF ATTORNEY GENERAL
THE CAPITOL
2ND FLOOR
ALBANY, NY 12224


OFFICE OF ATTORNEY GENERAL
CARVEL STATE OFFICE BUILDING
820 FRENCH STREET, 6TH FLOOR
WILMINGTON, DE 19801


OFFICE OF THE U.S. TRUSTEE
33 WHITEHALL STREET
21ST FLOOR
NEW YORK, NY 10004


OVERTON & CO
2016 LINDEN BVLD
ELMONT, NY 11003


PRO ELEVATOR SERVICES INC
171 WEST STREET
BROOKLYN, NY 11222

R. ESMERIAN INC.
610 FIFTH AVENUE, ROOM 414
NEW YORK, NY 10020


REMCO MAINTENANCE LLC.
47-30 35TH STREET
LONG ISLAND CITY, NY 11101


S.J. PHILIPS, LTD.
139 NEW BOND STREET
LONDON, W1A3DL
UK


SDCA US ATTORNEY'S OFFICE
FEDERAL OFFICE BUILDING
880 FRONT STREET, ROMM 6293
SAN DIEGO, CA 92101


SECURITIES AND EXCHANGE COMMIS
100 F STREET, NE
WASHINGTON, DC 20549


SECURITIES AND EXCHANGE COMMIS
450 5TH STREET N.W.
WASHINGTON, DC 20549


SECURITIES AND EXCHANGE COMMIS
MARK SCHONFELD, DIRECTOR
3 WORLD FINANCIAL CENTER #400
NEW YORK, NY 10281


TANAGRO JEWELRY CORP.
5 EAST 57TH STREET
NEW YORK, NY 10022


US ATTORNEY'S OFFICE
DISTRICT OF DELAWARE
P.O. BOX 2046
WILMINGTON, DE 19899


US ATTORNEY'S OFFICE, NEVADA
333 LAS VEGAS BLVD SOUTH
SUITE 5000
LAS VEGAS, NV 89101

US ATTORNEY'S OFFICE, SDNY
THE SILVIO MOLLO BUILDING
ONE SAINT ANDREWS PLAZA
NEW YORK, NY 10007


VERIZON
P.O. BOX 4832
TRENTON, NJ 08650


WATCH SERVICE CENTER
10 WEST 47TH STREET, BOOTH 22
NEW YORK, NY 10036


WELLS FARGO INSURANCE
330 MADISON AVENUE
7TH FLOOR
NEW YORK, NY 10017